UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NAKIA D. SHANNON,

        Plaintiff,

        v.                                      Case No. 19-C-504

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

---

**DECISION AND ORDER REVERSING DECISION OF COMMISSIONER**

---

        Plaintiff Nakia Shannon, who was previously determined to be disabled and received social security disability income under Title II of the Social Security Act (SSA), filed this action for judicial review of a decision by the Commissioner of Social Security terminating his benefits. The Commissioner found that Plaintiff was no longer disabled as of December 31, 2015, and that he has not become disabled after that date. After unsuccessful attempts to convince the agency to reverse its decision, Plaintiff filed this action under 42 U.S.C. § 405(g). For the reasons that follow, the decision of the Commissioner will be reversed and remanded.

## BACKGROUND

        In a three-page decision dated October 19, 2010, administrative law judge (ALJ) Patrick D. Halligan determined that Plaintiff was disabled under Sections 216(i) and 223(d) of the SSA since September 1, 2009. R. 141. ALJ Halligan found that Plaintiff's severe impairments included a sleep-related breathing disorder, narcolepsy with cataplexy, and obesity. R. 140. ALJ Halligan determined that Plaintiff's impairments medically equaled Listing 11.03 as then defined in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Accordingly, Plaintiff was found to be disabled. R. 141.

On October 28, 2015, Plaintiff was sent a notice of disability cessation. R. 203. The notice stated that the medical evidence demonstrated Plaintiff's health had improved and that he was able to work. *Id*. On November 12, 2015, the agency received Plaintiff's request for reconsideration. A reconsideration hearing was held on January 6, 2017. R. 212. A July 18, 2017 decision affirmed the finding that Plaintiff's health had improved and that he was able to work. R. 247. Plaintiff subsequently requested a hearing before an ALJ. R. 250. On June 26, 2018, ALJ Dean Syrjanen (hereinafter, the ALJ) conducted a hearing in Milwaukee, Wisconsin, where Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 83.

At the time of the June 26, 2018 hearing, Plaintiff testified that he lived in Racine, Wisconsin. R. 89. Plaintiff completed some college and obtained an associate degree in customer service. R. 100. During 2015 and 2016 Plaintiff testified he did "work study" in a computer lab for about 12 to 15 hours per week while he was attending classes. R. 91, 100. Plaintiff's job was to monitor the facility and help people log in. *Id*. Plaintiff testified he lost this job because he fell asleep behind his desk. *Id*. He worked in customer service at Foot Locker in 2005 and 2006, which he said was his last full-time work. R. 92. Plaintiff said he lost this job because of his tardiness and because Foot Locker had fired the whole staff due to theft issues. R. 93.

Plaintiff asserted that his sleep-related medical issues, including his narcolepsy, sleep apnea, and cataplexy prevented him from working. He testified he first had these sleep-related problems when he was 15-years-old. *Id*. The ALJ asked why Plaintiff was able to maintain full-time work until 2008. R. 93–94. Plaintiff explained that his employers were able to accommodate him previously, until his need for 15 to 20-minute nap breaks on the job became excessive and he was terminated. R. 94. Plaintiff said that he became more upfront about his need for a nap break, but employers were unwilling to accommodate him. *Id*.

2

Plaintiff then described his sleep attacks. He testified that he never knows when an attack is coming and, when one occurs, he "just falls asleep." R. 95. Plaintiff said his attacks vary in length, but last sometimes 20 minutes or a little longer; sometimes his body is numb before an attack. R. 95, 110. He explained that an attack can occur if he is too comfortable or sits too long and other times when he is talking to someone. He testified that sometimes he wakes up on his own, and other times someone else wakes him up after an attack. Plaintiff said he has up to seven attacks on a typical day, occurring at random times. R. 96. Plaintiff testified he never goes a day without an attack. R. 96–97.

Plaintiff was prescribed a nebulizer machine but discontinued it because the frequency of his attacks at night was so high, he would doze off before putting on the device. R. 97. He said he stopped using a CPAP breathing machine for similar reasons. *Id*. Plaintiff stated his doctor tried him on different medications for his narcolepsy. R. 98. Xyrem did not prevent Plaintiff's attacks even though it helped him sleep better; Plaintiff said he could no longer afford it due to his lack of income. *Id*. Plaintiff was also previously on Vyvanse. *Id*. He currently took 30 milligrams of D'Amphetamine, which he said helps him start up sooner. R. 99. Plaintiff said he was prescribed four Adderall pills per day, but his doctors cut him back to two per day after new medical law changes. R. 105. After taking an Adderall, Plaintiff still has attacks but said the attacks he experiences are not as severe—not as long, hard, or fast. R. 106.

Plaintiff also spoke about his cataplexy, which causes him restless leg syndrome. R. 99. He said he can have three cataplexy attacks per day. R. 105. Plaintiff also testified that he has been depressed since January 17, 2018, when his son died. R. 107. Plaintiff indicated that, before his son's death, Plaintiff had depression that was not as severe, and he did not receive treatment for it. *Id*. Plaintiff testified that he feels loneliness and does not care if he lives or dies. *Id*.

3

When asked about his daily activities, Plaintiff testified that, on some days, it is difficult for him to get dressed and take care of his personal needs until he is forced to do so by others. R. 102. Plaintiff said, some days, his 18-year-old daughter will pick him up and take him to family and friends. R. 101–02. Plaintiff said his daughter and another individual take care of all of his cooking and cleaning at home. R. 102. He also testified that he drives about three times per week, though he has some difficulties driving because he occasionally has an attack. R. 90. He has had an attack while driving but testified that his son was able to grab the wheel and avoid an accident. *Id*.

The ALJ held a supplemental hearing on August 2, 2018, because the ALJ discovered that opinion evidence in Plaintiff's file had not been appropriately exhibited by the agency. R. 39, 41. At the supplemental hearing, Plaintiff's attorney raised several procedural concerns. Counsel noted that he received a voicemail from the ALJ's staff encouraging him to waive proffer, which counsel stated was not in accordance with the agency's HALLEX procedures. R. 44. Subsequently, counsel had a conversation with another member of the ALJ's staff who indicated that a supplemental hearing was needed because "the file was out of order at the time of the hearing" and to "clean up things." R. 45. Counsel asked the ALJ whether, after the initial hearing, his decision would have been to terminate benefits and the ALJ replied that it was. R. 47. Given this, counsel raised a concern that the agency was encouraging him to waive proffer when it had already decided to terminate his benefits—thereby denying Plaintiff's right to a supplemental hearing if he had agreed to waive. *Id*. The ALJ assured counsel that he was not involved in these conversations and there was no suggestion or encouragement on his part to waive proffer of evidence that was subsequently added to Plaintiff's file. *Id*.

Counsel also raised issues concerning statutory benefit continuation and the need for a medical expert. Counsel argued that when medical test results were in question, the HALLEX

4

procedures required the ALJ to appoint a medical expert (in this case to address objective sleep latency testing Plaintiff underwent that showed he had narcolepsy and cataplexy). R. 48–49. The ALJ said he did not find good cause for statutory benefit continuation and rejected the notion that he was required to appoint a medical expert. R. 49–50. The ALJ further stated that there "is a medical test in the file that confirms that your client has been diagnosed with, or meets the requirements of a narcolepsy diagnosis. I'm not challenging that diagnosis or the results of those tests. My job as an ALJ is to determine functioning and what—whether [sic] his impairments allow him to do in a work-related situation." R. 51.

After much discussion concerning the ALJ's refusal to discuss the evidence and credibility findings that led to his initial, unwritten decision to terminate benefits prior to granting the supplemental hearing, Plaintiff's counsel requested the ALJ recuse and substitute another judge in the matter for three reasons. R. 67. First, counsel argued that the timing of the supplemental hearing provided about 10 days' notice, which was insufficient for Plaintiff to arrange for his own medical expert. R. 68. Second, counsel cited the agency's own errors that led to records not being properly exhibited and necessitated the supplemental hearing. R. 68–69. Third, counsel criticized the ALJ's refusal to grant statutory benefit continuation in light of the need for a supplemental hearing and the choice of only providing hearing dates in August and May. *Id.* The ALJ stated that he would take the recusal request under advisement and give it "serious thought." R. 70.

At the supplemental hearing, Plaintiff provided additional testimony about his symptoms. Plaintiff testified that he was at an appointment with Dr. Nicholson the day before the supplemental hearing where he fell asleep. R. 72. Plaintiff added that, during the last few appointments with Dr. Nicholson, he has had sleep attacks and muscle attacks. *Id.* Plaintiff confirmed that he takes his Adderall daily and that these naps are "involuntary." R. 74. He described a multi-sleep latency test from the fall of 2017 where his brain waves indicate he has narcolepsy. R. 76. Plaintiff

5

testified that he also underwent multi-sleep latency tests in 2009 and 2015. R. 78. The ALJ confirmed that these tests were not in the file and agreed to hold the record open for two weeks for them to be provided. R. 79.

In a seventeen-page decision dated October 23, 2018, the ALJ found that Plaintiff's disability ended on December 31, 2015, and that he had not become disabled again thereafter. R. 29. To reach this conclusion, the ALJ's decision cited the eight-step evaluation process to determine if a claimant continues to be disabled. R. 16. At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity through the date of his decision. R. 17. At step two, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. The ALJ found at step three that Plaintiff had medical improvement that occurred by December 30, 2015. R. 18. At step four, the ALJ determined that Plaintiff's medical improvement was related to his ability to work. *Id*. The ALJ did not state that one of the exceptions at step five applied. At step six, the ALJ found that Plaintiff continued to have severe impairments, including sleep-related breathing disorder, narcolepsy with cataplexy, and obesity. R. 19. At step eight, the ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels except that he had certain non-exertional limitations: "He can never climb ladders, ropes and scaffolds and can never be exposed to hazards, such as moving mechanical parts or unprotected heights. He would be off task up to ten percent of the workday in addition to regularly scheduled breaks." R. 20. At step eight, the ALJ concluded that Plaintiff could perform past relevant work as a shoe salesperson. R. 27. In addition, relying on testimony provided by the vocational expert (VE) at the hearing, the ALJ concluded there were other jobs that existed in the national economy that Plaintiff could perform, including as a cashier, hand packager, or office helper. R. 28–29. Accordingly, the ALJ concluded that Plaintiff had not been disabled since

6

December 31, 2015.  R. 29.  The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  R. 1.

## LEGAL STANDARD

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence.  42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).  Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion."  *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).  Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn.  *Jelinek*, 662 F.3d at 811.  The ALJ must provide a "logical bridge" between the evidence and conclusions.  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination.  Failure to do so, unless the error is harmless, requires reversal.  *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility.  *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).  Finally, judicial review is limited to the rationales offered by the ALJ.  *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Listing 11.02

Plaintiff asserts that the ALJ erred at step two of the continuing disability review (CDR) process because he did not properly assess whether Plaintiff's conditions meet or equal Listing 11.02. After a disability determination, the agency must conduct a continuing disability review to

7

evaluate the claimant's impairments and determine whether the claimant is eligible for disability benefits. 20 C.F.R. § 404.1589. The agency evaluates decisions of continuing disability using an eight-step sequential-evaluation process, referred to as the "8-Step CDR Evaluation Process," set forth in 20 C.F.R. § 404.1594(f).

The SSA's regulations provide that a claimant is presumed disabled if he has an impairment that meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. § 404.1525(a). A claimant may also demonstrate presumptive disability by showing that his impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* § 404.1526(a). "'In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing.'" *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (quoting *Burnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

In a decision dated October 19, 2010, an ALJ determined that Plaintiff was disabled and had impairments that medically equaled Listing 11.03. R. 140. At the time of the 2010 decision, Listing 11.03 provided,

> 11.03 Epilepsy—non-convulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective August 2, 2010 to March 23, 2011). As of March 2018, Listing 11.03 was superseded by Listing 11.02. The agency's guidelines specify that Listing 11.02 is the applicable listing to assess the severity of narcolepsy. *See* POMS DI 24580.005 ("Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical

8

severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy."). In the ALJ's 2018 decision, rather than assess whether a current listing applied as required under 20 C.F.R. § 404.1594(f)(1), the ALJ considered whether Plaintiff's conditions met or medically equaled the prior listing. *See* R. 17 ("[S]ince December 31, 2015, the overall record does not substantiate that the claimant has had seizure-like activity as frequently or acute as described in listing 11.03."). Stated differently, the ALJ considered Listing 11.03 instead of superseding Listing 11.02.

Plaintiff argues that the ALJ failed to consider whether his conditions equaled those of current Listing 11.02(B), as was required under step two of the CDR. Listing 11.02(B) reads as follows:

> 11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by . . . [d]yscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C).

20 C.F.R. Pt. 404, Subpt. P, App. 1 (effective March 14, 2018). The Commissioner admits that the "ALJ's decision did not explicitly state that Plaintiff's impairments did not meet or medically equal a listed section." Def.'s Br. at 9, Dkt. No. 22. The Commissioner argues, however, that the error is harmless because the ALJ's decision, read as a whole, clearly shows that Plaintiff does not meet or equal a listing.

Plaintiff asserts that the requirements for Listing 11.02 were satisfied by the ALJ's finding that his narcolepsy will result in one to two uncontrollable sleep attacks per day. *See* R. 26. He claims that one to two uncontrollable sleep attacks are "well in excess" of the listing level requirement of one per week. Pl.'s Br. at 18, Dkt. No. 15. In his decision, the ALJ noted that, at Plaintiff's August 27, 2018 appointment with Dr. Habel, Dr. Habel opined that "[g]iven his markedly abnormal [multiple sleep latency test (MSLT)] last year it is expected he will have at least 1-2 sleep attacks daily." R. 1163. The ALJ explained that he did "not dispute that the

9

claimant has narcolepsy, as was documented by the October 2017 MSLT." R. 26. The ALJ noted, however, that Dr. Habel "is imprecise and does not provide any detail about length of sleep attacks or how they functionally limit the claimant." *Id.* "Thus," the ALJ concluded, "the claimant's condition is adequately accommodated with the work restrictions listed above, which includes a provision that allows the claimant to be off task up to 10% of the workday, which should provide for 1-to-2 sleep attacks per day." *Id.*

The ALJ failed to explain why, despite finding that Plaintiff would have one-to-two sleep attacks per day, Plaintiff did not satisfy the standards of Listing 11.02(B), which only requires dyscognitive seizures occurring at least once a week. Without an explanation, the court cannot say that substantial evidence supports the ALJ's determination that Plaintiff did not meet or medically equal a listing or that his discussion of the listings was sufficient. Accordingly, this matter must be remanded.

Plaintiff also challenges the ALJ's finding that his one-to-two sleep attacks per day can be accounted for with a 10% time-off-task limitation and his failure to consider the VE testimony that the need for one unscheduled break of up to 15 minutes per day would be work preclusive. Falling asleep one or two times during the day is not the same as being off task 10% of the time. Plaintiff asserts that being uncontrollably asleep on the job for at least 15 minutes would, in fact, be work preclusive. Pl.'s Br. at 27. The ALJ should also address these concerns on remand.

**B. Statutory Benefit Continuation**

Plaintiff asserts that the ALJ should have allowed statutory benefit continuation pending the outcome of his appeal in this case and that the court should order statutory benefit continuation during the pendency of the remand. When a claimant is notified that his benefits will cease due to medical improvement, the claimant is entitled to apply to have his benefits continued during the course of his appeal. A request for a continuation of benefits must be made no later than 10 days

10

after the claimant receives notice of the agency's initial determination. 20 C.F.R. § 404.1597a(f). If a claimant fails to request a continuation of benefits within the ten-day period, the agency determines whether good cause exists for the late request. 20 C.F.R. § 404.911.

In this case, Plaintiff's initial cessation notice was dated October 28, 2015. Plaintiff had until November 12, 2015, to request a continuation of benefits but did not do so. Instead, Plaintiff requested reconsideration of the initial decision on November 12, 2015, and he received the agency's reconsideration decision on July 18, 2017. Plaintiff therefore had until August 3, 2017, to request the continuation of his benefits. Plaintiff did not request payment continuation until October 4, 2017. R. 263–66.

Plaintiff claimed that he could not file a timely request because he was at his aunt's funeral in Memphis, Tennessee in July 2017 and did not return until after August 2017. He also maintained that, when he returned in August 2017, he retrieved his mail and immediately went to the agency's field office to request an appeal. He also said, however, he could not access his mail without his mother because it was being held at the post office under her name while they were out of town and he used her address for his mail. R. 89, 557.

The ALJ found that Plaintiff did not timely request statutory benefit continuation for continued benefits pending the outcome of his appeal of the agency's medical cessation determination and did not find good cause to excuse Plaintiff's late request. R. 14. The ALJ explained that he did not find credible Plaintiff's explanation that he missed the deadline because he was at his aunt's funeral. The ALJ noted that Plaintiff alleged that he actually attended his mother's cousin's funeral, rather than his aunt's, and provided an obituary listing a funeral date of May 7, 2017. *Id.* The ALJ observed that Plaintiff would have had to stay in Memphis for more than three and a half months after the funeral. *Id.* The ALJ concluded that, given the factual contradictions present and the amount of time that passed before Plaintiff requested benefit

11

continuation, Plaintiff had not established good cause. The ALJ provided good reasons for finding that Plaintiff did not establish good cause to excuse his untimely request for a continuation of benefits. The court will therefore not order statutory benefit continuation on remand.

## CONCLUSION

For the reasons above, the Commissioner's decision is **REVERSED** and **REMANDED** to the Agency pursuant to 42 U.S.C. § 405(g) (sentence four). Although the court has concluded that remand is warranted based on the ALJ's failure to consider whether Plaintiff's impairments meet or medically equal a listing, the Commissioner should address Plaintiff's claim that the ALJ's 10% time-off-task limitation does not adequately account for his one-to-two daily sleep attacks. Further consideration of these and other claimed errors on remand will aid in reaching a final resolution of the case and avoid further remands in the future. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 30th day of November, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge